# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2022AP968

Complete Title of Case:

> **MIDWEST RENEWABLE ENERGY ASSOCIATION,**
>
> > **PETITIONER-APPELLANT,**
>
> **V.**
>
> **PUBLIC SERVICE COMMISSION OF WISCONSIN,**
> **SUMMER STRAND, KRISTY NIETO, AND MARCUS HAWKINS,**
>
> > **RESPONDENTS-RESPONDENTS,**
>
> **V.**
>
> **MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,**
>
> > **INTERVENOR,**
>
> **WISCONSIN UTILITIES ASSOCIATION,**
>
> > **INTERVENOR-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | May 31, 2024 |
| Oral Argument: | November 16, 2023 |

| | |
|---|---|
| JUDGES: | Kloppenburg, P.J., Blanchard, and Taylor, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the petitioner-appellant, the cause was submitted on the briefs of and oral argument by *David C. Bender* of *Earthjustice*. |

Respondent
ATTORNEYS: On behalf of the respondents-respondents, the cause was submitted on the brief of *Cynthia E. Smith*, *Zachary Peters*, and *Stephanie Bedford* of Public Service Commission of Wisconsin. There was oral argument by *Zachary Peters*.

On behalf of the intervenor-respondent, the cause was submitted on the brief of *James E. Goldschmidt*, *Patrick Proctor-Brown*, *Lauren N. Zenk*, and *Bradley D. Jackson* of *Quarles & Brady LLP*, Madison. There was oral argument by *James E. Goldschmidt*.

**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 31, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP968**

**STATE OF WISCONSIN**

Cir. Ct. No. 2021CV41

**IN COURT OF APPEALS**

---

MIDWEST RENEWABLE ENERGY ASSOCIATION,

    PETITIONER-APPELLANT,

  V.

PUBLIC SERVICE COMMISSION OF WISCONSIN,
SUMMER STRAND, KRISTY NIETO, AND MARCUS HAWKINS,

    RESPONDENTS-RESPONDENTS,

  V.

MILWAUKEE METROPOLITAN SEWERAGE DISTRICT,

    INTERVENOR,

WISCONSIN UTILITIES ASSOCIATION,

    INTERVENOR-RESPONDENT.

---

APPEAL from an order of the circuit court for Portage County: THOMAS B. EAGON, Judge. *Reversed and cause remanded with directions.*

Before Kloppenburg, P.J., Blanchard, and Taylor, JJ.

¶1    TAYLOR, J.  Midwest Renewable Energy Association ("Midwest") appeals a circuit court order dismissing its action for declaratory and injunctive relief against the Wisconsin Public Service Commission and its three Commissioners (collectively "the Commission").[1]  In pertinent part, Midwest's action challenged a temporary order issued by the Commission in 2009 ("the Order") that prohibits the retail customers of Wisconsin's four largest public electric utilities, as well as entities known as "aggregators of retail customers," from engaging in "demand response" activities in federally-regulated interstate wholesale electricity markets.

¶2    As pertinent to this appeal, Midwest's complaint sought a declaratory judgment that the Order is invalid on the ground that it is a "rule" that the Commission adopted without complying with statutory rulemaking procedures.[2]  The complaint also sought declaratory and injunctive relief precluding the Commission from enforcing the Order.  The circuit court dismissed all claims, and Midwest appeals.[3]

---

[1] Midwest's complaint named then-Commissioners Rebecca Cameron Valcq, Ellen Nowak, and Tyler Huebner as defendants in their official capacities.  We take judicial notice that these three individuals no longer serve as Commissioners.  As a result, their successors are automatically substituted as respondents, as reflected in the caption.  WIS. STAT. § 803.10(4)(a) (2021-22).

[2] Midwest also contends that the Order exceeds the Commission's statutory authority. As explained further below, we do not address that issue in this opinion.

[3] The Commission's brief does not comply with WIS. STAT. RULE 809.19(8)(bm) (2021-22), which addresses the pagination of appellate briefs.  *See* RULE 809.19(8)(bm) (2021-22) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover").  This rule has recently been amended, see S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), and the reason for the
(continued)

¶3    For the following reasons, we conclude that the Order is invalid because it meets the statutory definition of a rule and, therefore, should have been but was not proposed and promulgated in compliance with the statutory rulemaking procedures set forth in WIS. STAT. ch. 227 (2021-22).[4]  Accordingly, we reverse and remand for the circuit court to enter a judgment declaring the Order invalid.

## BACKGROUND

¶4    The market for electricity in the United States is generally divided into two categories:  wholesale sales by electricity producers to public utilities and retail sales by public utilities to consumers.  *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 266-67 (2016) ("*EPSA*").  Interstate wholesale electricity sales fall under the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"), while the regulation of "any other sale"—such as retail sales of electricity—is left to the jurisdiction of the individual states.  *Id.* at 265-66.  In Wisconsin, the authority to regulate public utilities and the retail sale of electricity is vested in the Commission.  *See* WIS. STAT. § 196.02(1).

---

amendment is that briefs are now electronically filed in PDF format, and are electronically stamped with page numbers when they are accepted for efiling.  As our supreme court explained when it amended the rule, the new pagination requirements ensure that the numbers on each page of a brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief.  S. CT. ORDER 20-07 cmt. at xl.

[4] As noted, the Order was issued in 2009.  With the exception of the definition of a "rule" set forth in WIS. STAT. § 227.01(13) (2007-08), *infra* ¶44, there have not been substantive material changes since that time to the statute sections that we cite and analyze in this opinion. Therefore, for ease of reading, all references to the Wisconsin statutes are to the 2021-22 version unless otherwise noted.

¶5 Simplifying for current purposes, in order to ensure "just and reasonable" wholesale electricity rates in interstate markets, FERC has encouraged the creation of nonprofit entities to manage these markets by region. *EPSA*, 577 U.S. at 267. These nonprofit entities are known as "independent system operators." The independent system operator for the region that includes Wisconsin is the Midcontinent Independent System Operator ("MISO"). *County of Dane v. PSC*, 2022 WI 61, ¶48, 403 Wis. 2d 306, 976 N.W.2d 790. Like other independent system operators, MISO sets wholesale prices for electricity by conducting competitive auctions. *EPSA*, 577 U.S. at 268. In essence, on a given day, MISO collects orders from utilities specifying how much electricity the utilities need at various times and in various locations on the following day and accepts bids from electricity generators specifying how much electricity they can produce at those times and locations and how much they will charge for it. *Id.* at 268-69. MISO accepts the generators' bids, considering cost first, until the total electricity demand of the utilities is met. *Id.* at 268. The price of the last unit of electricity purchased by MISO, *i.e.*, the most expensive unit of electricity purchased, becomes the price used to pay every electricity generator whose bid was accepted, regardless of the actual bid price. The total cost for generating the electricity is split among the utilities in proportion to how many units of energy each utility has ordered at a given time. *Id.*

¶6 As a result, when utilities' demands for electricity increase—for instance, on a hot day when retail electricity customers turn on their air conditioning—more generation is needed from more expensive generators. *Id.* at 269. In addition, during such "peak" usage, an increased flow of electricity is pushed through the electricity grid, which may overload transmission lines and result in electricity disruptions. Both of these consequences of peak usage provide

incentives for the wholesale market operators to reduce electricity use at peak times. *Id.* at 269-70.

¶7    Because there are times when encouraging retail customers to reduce their electricity consumption costs less than paying electricity generators to produce more electricity, Congress and the regional wholesale market operators called on FERC to eliminate barriers for customers to participate in a practice known as "demand response." *Id.* at 270-72. This practice operates within the regular auctions for electricity in federal interstate wholesale markets and allows retail customers to submit bids to decrease their electricity consumption by a set amount at a set time for a set price. *Id.* at 270-71. In essence, the practice of demand response "pays consumers for commitments to curtail their use of power, so as to curb wholesale rates and prevent grid breakdowns." *Id.* at 270. One way that consumers may participate in demand response is through "aggregators of retail customers" ("ARCs"), entities that coordinate demand response by aggregating multiple individual retail consumers' demand response bids into one bid and submitting that bid in federal wholesale market auctions. *See id.*; *Indiana Util. Regul. Comm'n v. FERC*, 668 F.3d 735, 736-37 (D.C. Cir. 2012).

¶8    In 2008, to facilitate demand response participation in the wholesale market by retail customers and ARCs, FERC issued Order No. 719 ("FERC Order No. 719"), which was later codified in 18 C.F.R. § 35.28(g)(1) (2024).[5]  *EPSA*, 577 U.S. at 272. In relevant part, FERC Order No. 719 creates two tiers of retail

_____

[5]  The current version of 18 C.F.R. § 35.28(g)(1) is identical in all material respects to the version in effect in 2009 when the Order at issue here was adopted. Therefore, for ease of reading, all references to the Code of Federal Regulations are to the 2024 version unless otherwise noted.

electricity customers for the purposes of demand response: the customers of utilities that distributed more than 4 million megawatt-hours (MWh) in the previous fiscal year ("large utilities") and the customers of utilities that distributed 4 million MWh or fewer in the previous fiscal year ("small utilities"). *See* 18 C.F.R. § 35.28(g)(1)(iii). This regulation requires MISO and other regional market operators to accept demand response bids from ARCs that aggregate the demand response of retail customers of large utilities, except when the state regulatory authority "prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers." 18 C.F.R. § 35.28(g)(1)(iii).[6] As a result, unless there is a specific prohibition by the

---

[6] 18 C.F.R. § 35.28(g)(1)(iii) provides, in full:

> *Aggregation of retail customers.* Each Commission-approved independent system operator and regional transmission organization must accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, and the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, where the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers. An independent system operator or regional transmission organization must not accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, where the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers, or the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, unless the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers.

(continued)

Commission, ARCs that aggregate the demand response of retail customers of large utilities in Wisconsin may participate in demand response in wholesale electricity markets. No party identifies any statute, administrative regulation, or other electric retail regulatory action in Wisconsin that prohibited ARCs from submitting demand response bids of retail customers of large utilities in federal wholesale markets on behalf of Wisconsin retail electricity customers at the time that FERC Order No. 719 was adopted in 2008.

¶9     In April 2009, following the release of FERC Order No. 719, the Commission issued an "Amended Notice of Investigation and Request for Comments" regarding ARC operations in Wisconsin. The Commission issued this amended notice in a docket that was opened as a summary investigation to develop and analyze electric rate designs and load management options in accordance with the Governor's Task Force on Global Warming.[7] This amended notice sought written comments about possible ARC operations in Wisconsin and appears to have been distributed to utilities, the entities granted intervenor status in the original investigation, and various press outlets.

---

As referenced in the foregoing quote, FERC Order No. 719 provides that independent system operators may not accept bids from ARCs aggregating the demand response of retail customers of small utilities, except when expressly permitted by the state regulatory authority. *See* 18 C.F.R. § 35.28(g)(1)(iii). As a result, in order for ARCs to aggregate the demand response of retail customers of small utilities in Wisconsin and participate in demand response in the wholesale market, there must be an explicit allowance to do so by the Commission. This situation involving small utilities is not at issue here.

[7] This investigation was authorized under WIS. STAT. § 196.28(1), which provides: "If the commission believes … that an investigation of any matter relating to any public utility should for any reason be made, the commission on its own motion summarily may investigate[.]"

¶10 In October 2009, the Commission issued the Order, which is titled "Order Temporarily Prohibiting Operation of Aggregators of Retail Customers."[8] In relevant part, the Order imposes the following prohibition:

> As a condition on the provision of electric service, demand response load reductions of retail customers of the four Wisconsin electric utilities which distribute more than 4 million MWh per year (named above)[9] are prohibited from being transferred to MISO markets directly by retail customers or by third-party ARCs.[10]

We refer to this as the "prohibition sentence" of the Order. The Order provides that this prohibition will remain in effect until rescinded by another Commission order. To date, the Commission has not rescinded the Order.

¶11 There is no dispute that, in issuing the Order, the Commission did not comply with the pertinent rulemaking procedures set forth in WIS. STAT. ch. 227. There is also no dispute that none of the four utilities identified in the Order took or ceased any actions in response to the Order.

¶12 In 2021, Midwest filed a complaint in the Portage County Circuit Court seeking, among other claims not at issue here, a declaratory judgment

---

[8] Wisconsin Pub. Serv. Comm'n, *Order Temporarily Prohibiting Operation of Aggregators of Retail Customers*, Docket No. 5-UI-116 (Oct. 9, 2009).

[9] The Order identifies the following electric utilities as distributing more than 4 million MWh per year: Northern States Power Company-Wisconsin, Wisconsin Power and Light Company, Wisconsin Electric Power Company, and Wisconsin Public Service Corporation.

[10] By its explicit terms, the Order does not explain what would distinguish a "third-party" ARC from other ARCs, nor do the parties on appeal shed light on this topic. However, the Order explains that one of its purposes is to allow the Commission to "investigate the effects that ARCs may have on *utility-sponsored* demand response programs and utility planning." (Emphasis added.) We therefore infer that the phrase "third-party ARCs" refers to entities that offer demand response programs that are not sponsored by electric utilities.

pursuant to WIS. STAT. § 227.40 that the Order is invalid in part because it constitutes a "rule" that the Commission adopted without complying with statutory rulemaking procedures.[11]  Midwest also requested injunctive relief against the Commission to prevent the enforcement of the Order.  The Wisconsin Utilities Association ("Wisconsin Utilities") intervened in the circuit court action.[12]

¶13  The Commission and Wisconsin Utilities (collectively, "Respondents") moved to dismiss Midwest's complaint for failure to state a claim pursuant to WIS. STAT. § 802.06(2)(a)6.  In an oral ruling, the circuit court granted Respondents' motions to dismiss Midwest's claims regarding the Order.  On the rulemaking claim, the court said only that the court "didn't view [the Order] as a rule" and that it considered "the [Commission's] brief in support convincing in that regard."  Midwest appeals.

## DISCUSSION

¶14  To repeat, Midwest argues in pertinent part that the Order is invalid because it meets the definition of a "rule" and should have been but was not promulgated in compliance with statutory rulemaking procedures.  Midwest also argues that, if the Order is invalid for this reason, the Commission should be precluded from enforcing the Order or otherwise regulating demand response activities of retail customers and third-party ARCs in the wholesale electricity

---

[11] Midwest's complaint also included two claims related to solar power financing that are subject to an ongoing declaratory ruling proceeding before the Commission and are not at issue in this appeal.

[12] The Milwaukee Metropolitan Sewerage District also intervened, but it did not participate in this appeal.  We therefore do not mention the Milwaukee Metropolitan Sewerage District again in this opinion.

9

markets. For the following reasons, we conclude that the Order is invalid and therefore unenforceable because it meets the definition of a rule set forth in WIS. STAT. § 227.01(13) and should have been proposed as a rule and promulgated in compliance with the statutory rulemaking procedures set forth in WIS. STAT. ch. 227.[13]

## I. Governing Principles and Standard of Review

¶15 Except for specific statutory exceptions not at issue here, the exclusive means of judicial review regarding the validity of an administrative rule is an action for declaratory judgment. WIS. STAT. § 227.40(1).[14] Under this

---

[13] Because we conclude that the Order meets the statutory definition of a rule pursuant to WIS. STAT. § 227.01(13) and therefore should have been proposed and promulgated as a rule in compliance with the pertinent statutory rulemaking procedures in WIS. STAT. ch. 227, we do not address the alternative argument by Midwest that the Order is invalid because it exceeds the Commission's authority. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals generally decides cases "on the narrowest possible grounds"). The parties suggested at oral argument that we should not address the authority issue if we conclude that the Order meets the statutory definition of a rule under § 227.01(13). Further, we have no way of accurately predicting what sort of rule might be proposed in the future for which the authority issue might have relevance.

[14] WISCONSIN STAT. § 227.40 provides in relevant part:

> (1) Except as provided in sub. (2), the exclusive means of judicial review of the validity of a rule or guidance document shall be an action for declaratory judgment as to the validity of the rule or guidance document brought in the circuit court for the county where the party asserting the invalidity of the rule or guidance document resides or has its principal place of business or, if that party is a nonresident or does not have its principal place of business in this state, in the circuit court for the county where the dispute arose.…

> (2) The validity of a rule or guidance document may be determined in any of the following judicial proceedings when material therein:

(continued)

statute, a plaintiff may challenge the validity of an agency action on the ground that, while it meets the statutory definition of an administrative rule under WIS. STAT. § 227.01(13), it was not proposed and promulgated in compliance with the rulemaking procedures set forth in WIS. STAT. ch. 227. Sec. 227.40(4)(a). In this type of challenge, we refer to the agency action as an "unpromulgated rule." An agency action need not be called a "rule" to be deemed invalid as an unpromulgated rule. *See Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 820, 280 N.W.2d 702 (1979) ("That the ordinance [adopted by the Department of Natural Resources] was not formally promulgated and filed as a rule under the procedure set forth in ch. 227 … does not insulate the ordinance from judicial review pursuant to [§ 227.40]."). Indeed, "[a]n agency directive meeting the statutory definition of an administrative rule may appear in various forms." *Milwaukee Area Joint Plumbing Apprenticeship Comm. v. DILHR*, 172 Wis. 2d 299, 320, 493 N.W.2d 744 (Ct. App. 1992). If a court determines that an agency action constitutes an unpromulgated rule, then the court must declare the

> (a) Any civil proceeding by the state or any officer or agency thereof to enforce a statute or to recover thereunder, provided such proceeding is not based upon a matter as to which the opposing party is accorded an administrative review or a judicial review by other provisions of the statutes and such opposing party has failed to exercise such right to review so accorded.
>
> ….
>
> (e) Proceedings under [WIS. STAT. §§] 66.191, 1981 … or [§§] 40.65(2), 106.50, 106.52, 303.07(7) or 303.21 or [§§] 227.52 to 227.58 or under [WIS. STAT.] ch[s]. 102, 108 or 949 for review of decisions and orders of administrative agencies if the validity of the rule or guidance document involved was duly challenged in the proceeding before the agency in which the order or decision sought to be reviewed was made or entered.

rule invalid. Sec. 227.40(4)(a).[15] The court may issue a declaratory judgment regarding the validity of an agency action even if a petitioner has not previously asked the agency to determine the validity of the unpromulgated rule. Sec. 227.40(1).

¶16 As discussed in more detail below, whether an agency's action constitutes a "rule" under the definition of a rule in WIS. STAT. § 227.01(13) presents an issue of law that we review de novo. *Lamar Cent. Outdoor, LLC v. DHA*, 2019 WI 109, ¶10, 389 Wis. 2d 486, 936 N.W.2d 573; *see also* ***Wisconsin Prop. Tax Consultants, Inc. v. DOR***, 2022 WI 51, ¶13, 402 Wis. 2d 653, 976 N.W.2d 482 (whether an agency's action is an unpromulgated rule "requires only interpreting and applying [§ 227.01(13)] and its related procedural prerequisites" and is, therefore, a "question of law").

¶17 Respondents do not dispute that a circuit court's determination of whether an agency action satisfies the statutory definition of a rule is generally reviewed de novo on appeal. Nevertheless, Wisconsin Utilities argues that here, we should apply an erroneous exercise of discretion standard of review because a circuit court's decision to grant or deny declaratory relief under WIS. STAT. § 806.04 is a discretionary decision. We disagree that we are reviewing a discretionary decision. As Wisconsin Utilities correctly acknowledges, an action

---

[15] WISCONSIN STAT. § 227.40(4)(a) states:

> In any proceeding pursuant to this section for judicial review of a rule or guidance document, the court shall declare the rule or guidance document invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was promulgated or adopted without compliance with statutory rule-making or adoption procedures.

for declaratory judgment under WIS. STAT. § 227.40 is governed by the same principles as other actions for declaratory relief under § 806.04 (Wisconsin's Uniform Declaratory Judgments Act). *State ex rel. Hensley v. Endicott*, 2001 WI 105, ¶20, 245 Wis. 2d 607, 629 N.W.2d 686. Pursuant to those principles, we will uphold a circuit court's decision to grant or deny declaratory relief only if the court applied a proper standard of law. *See Olson v. Town of Cottage Grove*, 2008 WI 51, ¶35, 309 Wis. 2d 365, 749 N.W.2d 211 (stating the application of a proper standard of law as one of the prerequisites for upholding a discretionary decision). "[A]ny question of law that arises in reviewing whether the circuit court applied a proper legal standard is subject to de novo review." *City of Madison v. DWD*, 2003 WI 76, ¶10, 262 Wis. 2d 652, 664 N.W.2d 584. Here, the circuit court granted Respondents' motions to dismiss after making a legal determination without any discretionary decision making. For this reason, we apply de novo review.

¶18    We now proceed to discuss two preliminary matters before we reach the merits of Midwest's rulemaking claim:    (1) we address and reject Respondents' arguments that we should affirm because that claim is properly dismissed without reaching the merits; and (2) we clarify the approach to be taken by circuit courts when deciding motions to dismiss declaratory judgment claims on the merits, and by appellate courts when reviewing such decisions.

## II.  Respondents' Grounds for Dismissal Without Reaching the Merits

¶19    According to Respondents, we should affirm the dismissal of Midwest's rulemaking claim without reaching the merits for the following reasons:  (1) Midwest failed to challenge the Order within 30 days of service of the Order; (2) the Commission has primary jurisdiction over this issue; and

(3) Midwest failed to exhaust administrative remedies. We address and reject these arguments in turn.

## A. Thirty-Day Deadline

¶20 Respondents argue that we should affirm the dismissal of Midwest's rulemaking claim because Midwest failed to seek judicial review of the Order within 30 days of service of the Order pursuant to WIS. STAT. § 227.53(1)(a)2m. This statute provides: "Petitions for review of cases other than contested cases shall be served and filed within 30 days after personal service or mailing of the decision by the agency." Sec. 227.53(1)(a)2m. For the following reasons, we reject this argument.

¶21 As Midwest correctly observes, the 30-day deadline in WIS. STAT. § 227.53(1)(a)2m. applies only to "decisions" as specified in WIS. STAT. § 227.52. *See* § 227.53(1) ("[A]ny person aggrieved by a decision specified in [§] 227.52 shall be entitled to judicial review of the decision as provided in this chapter."). For its part, § 227.52 provides that "[a]dministrative decisions which adversely affect the substantial interests of any person" are subject to review, with certain exceptions that are not applicable here. Our supreme court has clarified that judicial review of "administrative decisions" under § 227.52 is distinct from judicial review of "rules" under WIS. STAT. § 227.40. ***Citizens for Sensible Zoning***, 90 Wis. 2d at 813 ("Chapter 227 of the statutes provides judicial review for two distinct types of administrative agency actions: rules ([§ 227.40]) and administrative decisions ([§ 227.52])."). As a result, a plaintiff's rulemaking claim under § 227.40(1) is not an action seeking review of an "administrative decision" for the purposes of § 227.52. ***Id.***; *see also* ***Frankenthal v. Wisconsin Real Est. Brokers' Bd.***, 3 Wis. 2d 249, 253-54, 88 N.W.2d 352 (1958) (stating

that an agency action that satisfies the definition of a "rule" does not constitute a "decision" within the meaning of § 227.52).

¶22 Here, as explained in more detail below, the Order satisfies the definition of rule pursuant to WIS. STAT. § 227.01(13). Therefore, we conclude that the Order is not an administrative decision under WIS. STAT. § 227.52 and, as a result, Midwest's rulemaking claim is not subject to the 30-day deadline set forth in WIS. STAT. § 227.53(1)(a)2m.[16]

## B. Primary Jurisdiction

¶23 Respondents argue that we should affirm the dismissal of Midwest's rulemaking claim under the primary jurisdiction doctrine because the Commission is better equipped and more capable of setting energy regulatory policy and assessing the complex subject matter of the Order than are the courts.

¶24 The primary jurisdiction doctrine is a doctrine of comity and judicial efficiency, not a limitation on the circuit court's jurisdiction. *Wisconsin Bell, Inc. v. DOR*, 164 Wis. 2d 138, 143-44, 473 N.W.2d 587 (Ct. App. 1991). This doctrine "comes into play when 'both a court and an administrative agency have jurisdiction over resolution of issues in a dispute.'" *Wisconsin Prop. Tax Consultants*, 402 Wis. 2d 653, ¶5 (quoting *City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 420, 491 N.W.2d 484 (1992)). In situations in which "both the court and the agency have authority to answer the

---

[16] The parties also dispute whether the Order was properly served on Midwest for the purposes of WIS. STAT. § 227.53(1)(a)2m. Because we conclude that this statute does not apply to Midwest's rulemaking claim, we need not address whether the service requirement was satisfied.

question presented, the circuit court has discretion to allow the agency to address the matter in the first instance or decide the question itself." ***Id.*** We review a circuit court's decision to dismiss a claim under the primary jurisdiction doctrine for an erroneous exercise of discretion. ***Id.***, ¶10.

¶25 Respondents' argument fails for two reasons: (1) the circuit court did not address the primary jurisdiction doctrine, and (2) the issue here is legal and does not require the application of agency expertise.

¶26 First, although the Commission asked the circuit court to invoke the primary jurisdiction doctrine, the court did not invoke this doctrine in its decision to dismiss Midwest's rulemaking claim. Like other discretionary decisions, a court's decision to invoke the primary jurisdiction doctrine must be supported by evidence that the court actually exercised its discretion and provided adequate justification for its decision. *See **County of Kenosha v. C & S Mgmt., Inc.***, 223 Wis. 2d 373, 407-08, 588 N.W.2d 236 (1999) ("[A] discretionary decision must be supported by 'evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth.'" (citation omitted)); *see also **Wisconsin Prop. Tax Consultants***, 402 Wis. 2d 653, ¶14 (reversing when the circuit court "gave no justification for its decision to defer on the question of whether the [Department of Revenue's] letter was an unpromulgated rule").

¶27 The bulk of the circuit court's decision dismissing Midwest's lawsuit involved other claims that are not the subject of this appeal. As summarized above, with respect to Midwest's rulemaking claim, the court said only, "The Court didn't view it as a rule…. And the Court did find the [Commission's] brief in support convincing in that regard." The court did not indicate that it invoked the primary jurisdiction doctrine or otherwise express that the Commission should

be allowed to address Midwest's challenge in the first instance. In other words, there was no exercise of discretion by the circuit court regarding primary jurisdiction for this court to review. "We may not exercise the [circuit] court's discretion." *State v. Hydrite Chem. Co.*, 220 Wis. 2d 51, 65, 582 N.W.2d 411 (Ct. App. 1998); *Wisconsin Ass'n of Food Dealers v. City of Madison*, 97 Wis. 2d 426, 434, 293 N.W.2d 540 (1980) ("The court which is to exercise the discretion is the trial, not the appellate, court." (citation omitted)).

¶28    The second reason that Respondents' argument fails is that Midwest's challenge was properly addressed to the circuit court and not to the Commission. When an issue involves "factual or specialized questions that fit 'squarely within the very area for which the agency was created,'" it is ordinarily appropriate to allow the agency to address the issue first. *Wisconsin Prop. Tax Consultants*, 402 Wis. 2d 653, ¶6 (quoting *Wisconsin Collectors Ass'n, Inc. v. Thorp Fin. Corp.*, 32 Wis. 2d 36, 44, 145 N.W.2d 33 (1966)). But in a case such as this one, in which "statutory interpretation or issues of law are significant," courts properly resolve the issues. *See id.* (citation omitted). "This is particularly so where the controlling issue is primarily a question of law that 'rests within the special expertise of the circuit court,' rather than the agency." *Id.* (citation omitted). For example, in *Wisconsin Property Tax Consultants*, our supreme court concluded that the determination of whether an agency action satisfies the definition of a rule under WIS. STAT. § 227.01(13) goes beyond the Department of Revenue's specialized knowledge and "presents a question that fits squarely within the expertise of the judicial branch." *Id.*, ¶15. It is true that the technical and regulatory aspects of the production, distribution, and sale of energy are complex in numerous respects. But Midwest's rulemaking claim does not require factfinding or specialized knowledge of these fields. Instead, as reflected by the

discussion in this opinion, Midwest's claim involves the interpretation of statutes and the language of the Order to determine whether the Order satisfies the statutory definition of an unpromulgated rule. As discussed above, this presents only issues of law that are properly addressed to the expertise of the courts.

¶29　For these reasons, we conclude that Midwest's rulemaking claim is not subject to dismissal under the primary jurisdiction doctrine.

## C. Exhaustion of Administrative Remedies

¶30　Respondents argue that we should affirm the dismissal of Midwest's rulemaking claim because Midwest failed to exhaust its administrative remedies by not asking the Commission to reopen the docket and rescind or alter the Order.[17]

¶31　Like the primary jurisdiction doctrine, the exhaustion doctrine does not place a limit on the circuit court's jurisdiction, but is instead "a rule of policy, convenience, and discretion." *County of Sauk v. Trager*, 118 Wis. 2d 204, 211-12, 346 N.W.2d 756 (1984). "The exhaustion doctrine is typically applied when a party seeks judicial intervention before completing all the steps prescribed in the hierarchy of administrative agency proceedings." *Id.* at 210. Requiring a party to complete all agency proceedings before initiating a legal action in the circuit court allows the agency "to perform the functions the legislature has

---

[17] This court may take judicial notice that the Commission Docket 5-UI-116 was closed in 2014 but was briefly reopened in 2021 before being closed again in 2022. *See Town of Holland v. PSC*, 2018 WI App 38, ¶30 n.9, 382 Wis. 2d 799, 913 N.W.2d 914 ("[T]he court may take judicial notice of the files of the [Commission]." (citation omitted)). The docket in which the Order was issued can be found at https://apps.psc.wi.gov/APPS/dockets/content/detail.aspx?id=5&case=UI&num=116.

delegated to it and to employ its special expertise and fact-finding facility." ***Metz v. Veterinary Examining Bd.***, 2007 WI App 220, ¶13, 305 Wis. 2d 788, 741 N.W.2d 244. As with primary jurisdiction, whether to apply the doctrine of exhaustion is within the circuit court's discretion. ***Clean Water Action Council of Ne. Wis. v. DNR***, 2014 WI App 61, ¶5, 354 Wis. 2d 286, 848 N.W.2d 336.

¶32 Respondents' argument that Midwest failed to exhaust its administrative remedies fails for multiple reasons. First, as with the primary jurisdiction doctrine, here there was no exercise of discretion by the circuit court for this court to review. The circuit court did not invoke the exhaustion doctrine or rely on any principle underlying that doctrine in its decision to dismiss Midwest's rulemaking claim. As explained above, there must be evidence in the record that the court actually exercised its discretion before a party is entitled to appellate review based on a purported discretionary act. *See C & S Mgmt., Inc.*, 223 Wis. 2d at 407-08.

¶33 Second, WIS. STAT. § 227.40 explicitly allows a plaintiff to petition the circuit court for declaratory relief without first asking the agency to rule on its claim. Sec. 227.40(1) ("A declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule or guidance document in question."). In other words, there were no "steps prescribed in the hierarchy of administrative agency proceedings" that Midwest was required to exhaust before initiating this action in the circuit court. *See Trager*, 118 Wis. 2d at 210.[18]

---

[18] The Commission argues that this provision of WIS. STAT. § 227.40(1) does not foreclose its exhaustion defense because the word "may" in that provision gives the circuit court

(continued)

¶34     Third, as with the primary jurisdiction doctrine, Midwest's rulemaking claim does not require the Commission to "employ its special expertise and fact-finding facility."  *See* ***Metz***, 305 Wis. 2d 788, ¶13.  Instead, Midwest's argument that the Order is an invalid, unpromulgated rule involves only issues of law that fall squarely within the circuit court's expertise.  *See* ***Wisconsin Prop. Tax Consultants***, 402 Wis. 2d 653, ¶15.

¶35     Therefore, we conclude that Midwest's rulemaking claim is not subject to dismissal under the exhaustion doctrine.[19]

## III.  The Propriety of Addressing the Merits of Midwest's Rulemaking Claim

¶36     We now explain the propriety of addressing the merits of Midwest's rulemaking claim by clarifying the approach to be taken by circuit courts when deciding motions to dismiss declaratory judgment claims on the merits, and the approach to be taken by appellate courts when reviewing such decisions.

¶37     As noted above, Respondents moved to dismiss Midwest's declaratory judgment action, including Midwest's rulemaking claim, for failure to

---

the discretion to consider a plaintiff's challenge in the first instance.  Assuming without deciding that this is a correct interpretation of § 227.40(1), the Commission's argument fails because, as explained above, the circuit court here did not exercise its discretion to dismiss Midwest's petition under the exhaustion doctrine.

[19] Wisconsin Utilities suggests that the Commission should be allowed to address Midwest's rulemaking claim in the first instance because the "underlying policy issue" will remain unresolved if, as a result of this opinion, the Order is invalidated as an unpromulgated rule.  However, our decision is limited to the narrow legal issue of whether the Order constitutes a rule, not whether the Order was a wise policy choice or whether it was within the Commission's authority.  We are not called on to address, and we express no opinion regarding, the underlying policy dispute regarding the propriety of demand response aggregation or retail customers' participation in demand response in wholesale energy markets.

state a claim under WIS. STAT. § 802.06(2)(a)6. "Whether a complaint states a claim upon which relief can be granted is a question of law for our independent review." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693. Such a motion tests only the sufficiency of the complaint and is not a procedure for resolving disputes of fact or the merits of the case. *Id.*, ¶19. Here, in granting Respondents' motions to dismiss, the circuit court went beyond the sufficiency of the complaint regarding Midwest's rulemaking claim and concluded that the Order is not a "rule" as a matter of law. For the following reasons, it is appropriate for this court also to decide whether the Order meets the statutory definition of a "rule," even though we are reviewing the circuit court's grant of Respondents' motions to dismiss for failure to state a claim.

¶38 Our supreme court has explained that, when a circuit court reaches the merits of a plaintiff's action for declaratory judgment, the proper procedure is for the court to render a judgment that sets forth the declaratory adjudication, and not to dismiss the complaint. *Iowa Nat'l Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 43 Wis. 2d 280, 285, 168 N.W.2d 610 (1969) ("A suit for declaratory relief decided on the merits calls for a declaratory adjudication in the judgment whether the adjudication is in favor of or adverse to the plaintiff and the dismissal of the complaint is improper."); *David A. Ulrich, Inc. v. Town of Saukville*, 7 Wis. 2d 173, 181, 96 N.W.2d 612 (1959) ("In a suit for a declaratory judgment under [WIS. STAT. § 806.04], where the subject matter of the suit is adjudicated, the complaint should not be dismissed but the judgment should set forth the declaratory adjudication."). As noted above, WIS. STAT. § 227.40 is governed by the same principles as other actions for declaratory relief under § 806.04. Therefore, the proper procedure in this case, given the circuit court's views, would have been for the court to render a declaratory adjudication that the Order is not a

rule rather than to dismiss the rulemaking claim on the merits.[20]   This is the procedure that circuit courts should follow in such instances.

¶39   In a case such as this one, in which the circuit court improperly dismissed a declaratory judgment action based on the court's view of the merits, we may construe the circuit court's decision to dismiss the declaratory judgment action as a declaratory adjudication.  *See, e.g.*, ***Liddicoat v. Kenosha City Bd. of Ed.***, 17 Wis. 2d 400, 405, 117 N.W.2d 369 (1962) (when the parties did not object to the circuit court dismissing the plaintiff's declaratory judgment action, our supreme court affirmed by modifying the judgment to grant declaratory relief rather than a dismissal); ***Denning v. City of Green Bay***, 271 Wis. 230, 236, 72 N.W.2d 730 (1955) (modifying the circuit court's dismissal and directing the court "to enter judgment for declaratory relief in accordance with the court's other conclusions of law").   Our supreme court has followed this approach when reviewing a dismissal of a declaratory judgment action addressing the validity of an agency action that meets the statutory definition of a rule.  *E.g.*, ***Citizens for Sensible Zoning***, 90 Wis. 2d at 813-14 (concluding that a Department of Natural Resources-adopted floodplain zoning ordinance satisfied the definition of a "rule" on review of a motion to dismiss).

---

[20] As reflected in our discussion above regarding threshold issues, a circuit court may of course properly dismiss an action for declaratory judgment on grounds other than the merits of the action.  *See* ***Olson v. Town of Cottage Grove***, 2008 WI 51, ¶32 & n.5, 309 Wis. 2d 365, 749 N.W.2d 211 (stating that a court may dismiss a declaratory judgment action for lack of justiciability because that is "a legal inquiry separate and distinct from determining whether to grant or deny declaratory relief on the merits"); ***Wisconsin Prop. Tax Consultants, Inc. v. DOR***, 2022 WI 51, ¶15, 402 Wis. 2d 653, 976 N.W.2d 482 (suggesting that a declaratory judgment action brought under WIS. STAT. § 227.40(1) may be dismissed pursuant to the primary jurisdiction doctrine).   But the dispositive issue in this appeal does not concern such grounds.

¶40     Further, the parties in this litigation—both before the circuit court and on appeal—have framed the legal issue as whether the Order is invalid as an unpromulgated rule.  As explained above, the question of whether an agency action satisfies the definition of a "rule" under WIS. STAT. § 227.01(13) is an issue of law that we review de novo.  *Wisconsin Prop. Tax Consultants*, 402 Wis. 2d 653, ¶13.  The parties do not identify any material disputes of fact that could preclude us from determining whether the Order satisfies this definition as a matter of law.

¶41     For these reasons, we conclude that it is appropriate to reach the merits of Midwest's rulemaking claim and determine whether the Order is an unpromulgated rule.  We now proceed to the merits.

### IV.  Whether the Order is Invalid as an Unpromulgated Rule

¶42     As noted above, the determination of whether an agency action constitutes an unpromulgated rule requires the interpretation and application of the statutory definition of a "rule" under WIS. STAT. § 227.01(13).  When interpreting statutes, Wisconsin courts begin "with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry."  *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted).  "Statutory language is given its common, ordinary, and accepted meaning."  *Id.*  If a statute is unambiguous, we apply the statute to the facts.  *Id.*, ¶46.  "[W]e confine our analysis of unambiguous laws to their text," not reaching beyond the text to consider "the practical, political, or policy implications of the law."  *Milwaukee Dist. Council 48 v. Milwaukee County*, 2019 WI 24, ¶18, 385 Wis. 2d 748, 924 N.W.2d 153.

¶43 This appeal also requires us to interpret the language of the Order. Because Commission orders have the same force of law as statutes, when we interpret the Order, we apply the same methodologies as we would in statutory interpretation. *See* **Thomson v. City of Racine**, 242 Wis. 591, 596, 9 N.W.2d 91 (1943) (Commission orders have the same force of law as statutes).

¶44 The word "rule" is defined in WIS. STAT. § 227.01(13) as follows:

> "Rule" means a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency.

Sec. 227.01(13) (2007-08).[21] Wisconsin courts have distilled this statutory definition of a "rule" under WIS. STAT. ch. 227 into a five-element test: "(1) a

---

[21] Although we apply the 2021-22 version of the statutes in most instances, when analyzing the definition of a "rule" set forth in WIS. STAT. § 227.01(13), we apply the 2007-08 version of the statutes in existence when the Order was issued. For background, in 2017, the legislature modified the definition of "rule" in WIS. STAT. § 227.01(13) so that, in relevant part, "an agency regulation, standard, statement of policy or general order of general application" must have the "force of law" instead of the "effect of law" to be a rule. 2017 Wis. Act 369, § 32. The parties neither identify this change nor suggest that this change affects our analysis, notably including our discussion in section IV.C. regarding the "effect of law" element of whether an agency action is a rule. At oral argument on appeal, however, the parties conceded that the law applicable to the Order was the law in existence at the time the 2009 Order was issued.

It appears from subsequent case law following this 2017 statutory change, however, that our supreme court has interpreted the "force of law" and "effect of law" phrases synonymously. *See* **Wisconsin Legislature v. Palm**, 2020 WI 42, ¶22, 391 Wis. 2d 497, 942 N.W.2d 900 ("**Palm**") (quoting **Citizens for Sensible Zoning, Inc. v. DNR**, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979), for the five-element rule test in determining whether an agency action is a rule as defined in WIS. STAT. § 227.01(13), which includes an agency action "having the effect of law"). Although we apply the "effect of law" language in § 227.01(13) as set forth in the 2007-08 Wisconsin statutes, we interpret this element consistent with the "force of law" language applied by our supreme court in later cases that addressed whether an agency action satisfied the five-element rule test, including **Palm** and **Tavern League of Wisconsin, Inc. v. Palm**, 2021 WI 33, ¶¶21, 22, 396 Wis. 2d 434, 957 N.W.2d 261 (lead op.).

regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency[.]" *Citizens for Sensible Zoning*, 90 Wis. 2d at 814. As stated previously, an agency action does not need to identify its action as a "rule" to satisfy this definition; it is the substance and not the label that matters. *Milwaukee Area Joint Plumbing Apprenticeship Comm.*, 172 Wis. 2d at 320.

¶45 The parties here agree that the Order satisfies the fourth element of the test because it was issued by the Commission, an administrative agency, but they dispute whether the Order satisfies the first, second, third, and fifth elements. We address each of those elements.

## A. Regulation

¶46 As referenced above, the first element to be considered when determining whether the Order is a rule is whether the Order is "a regulation, standard, statement of policy or general order." We conclude that the Order is a regulation.

¶47 The term "regulation" is not defined in WIS. STAT. ch. 227 or in the administrative statutes pertaining to agencies. However, we may consult a dictionary definition of this word to assist in the determination of its meaning. *Brown Cnty. Human Servs. v. B.P.*, 2019 WI App 18, ¶12, 386 Wis. 2d 557, 927 N.W.2d 560. One definition of a "regulation" is "[c]ontrol over something by rule or restriction." *Regulation*, BLACK'S LAW DICTIONARY (11th ed. 2019). Although the first part of this definition (defining "regulation" as control over something by "rule") is circular for current purposes, the second part of the

25

definition is helpful in that it shows that an agency action is a "regulation" if it represents control through restriction on conduct.

¶48 Although there is little direct discussion in the relevant case law regarding the meaning of "regulation" in WIS. STAT. § 227.01(13), several cases confirm that a "regulation" means control through restriction on conduct. *See Meyers v. Bayer AG*, 2007 WI 99, ¶23, 303 Wis. 2d 295, 735 N.W.2d 448 ("Previous cases construing a statute also become a part of our understanding of a statute's plain meaning."). For instance, in *Citizens for Sensible Zoning*, the Department of Natural Resources issued an order that adopted a flood plain zoning ordinance for an area in Columbia County. *Citizens for Sensible Zoning*, 90 Wis. 2d at 808. Our supreme court concluded that this flood plain ordinance was a "regulation" under § 227.01(13). *Id.* at 814-16. Although the court did not expressly define the word "regulation," it explained that the ordinance was a "regulation" because it "restrict[ed]" the conduct of individuals with a legal interest in the land affected by the ordinance. *Id.* Similarly, in *Wisconsin Electric Power Co. v. DNR*, 93 Wis. 2d 222, 287 N.W.2d 113 (1980), our supreme court determined that chlorine effluent limitations in Department of Natural Resources-issued pollution discharge permits, which controlled the permittees' use of chlorine by restricting that use within designated limits, were "regulations" for the purposes of § 227.01(13). *Wisconsin Elec. Power Co.*, 93 Wis. 2d at 232. In sum, the definition of "regulation" applied by our supreme court includes an agency action that controls through restrictions the conduct of the affected individuals or entities.

¶49 Here, the Order is a "regulation" under WIS. STAT. § 227.01(13) because, as discussed in more detail below, it controls the conduct of retail customers and third-party ARCs through the restriction of disallowing their

26

participation in demand response in federal wholesale electricity markets. Therefore, we conclude that the Order is a "regulation" and meets the first element of the five-element test.

## B. General Application

¶50 The parties' primary dispute centers on the second element of the definition of a "rule":  whether the Order is of general application.  To be of general application, an agency action "need not apply to all persons within the state.  Even though an action applies only to persons within a small class, the action is of general application if that class is described in general terms and new members can be added to the class." *Citizens for Sensible Zoning*, 90 Wis. 2d at 816.  In other words, an agency action is of general application if it "regulates" a generally described class of individuals and future members may be added to this class. *Wisconsin Legislature v. Palm*, 2020 WI 42, ¶24, 391 Wis. 2d 497, 942 N.W.2d 900 ("*Palm*").[22]

¶51 By contrast, an agency action is not of "general application" if it applies only to a specific, fixed set of individuals under specific factual scenarios.

---

[22] Based on *Palm*, 391 Wis. 2d 497, ¶¶23-24, we frame the "general application" inquiry as asking who the agency action "regulates."  For context, we note that Wisconsin courts have sometimes framed this inquiry as asking to whom the agency action "applies" or "is directed." *See, e.g.*, *Cholvin v. DHFS*, 2008 WI App 127, ¶25, 313 Wis. 2d 749, 758 N.W.2d 118 (stating that the agency action at issue is of general application because it "applies" to all Medicaid applicants); *Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d 804, 816 ("Even though an action applies only to persons within a small class, the action is of general application if that class is described in general terms and new members can be added."); *Milwaukee Area Joint Plumbing Apprenticeship Comm. v. DILHR*, 172 Wis. 2d 299, 317, 493 N.W.2d 744 (Ct. App. 1992) (determining the class to which the agency action is "directed").  But *Palm* establishes that the "general application" inquiry centers on who is "regulate[d]" by the agency action, whether that class is described in general terms, and whether new members can be added to that class. *Palm*, 391 Wis. 2d 497, ¶¶23-24.

*Cholvin v. DHFS*, 2008 WI App 127, ¶25, 313 Wis. 2d 749, 758 N.W.2d 118; *Milwaukee Area Joint Plumbing Apprenticeship Comm.*, 172 Wis. 2d at 317. Indeed, the definition of a "rule" in WIS. STAT. § 227.01(13) states in relevant part that it does not include agency actions "directed to" specifically named individuals who do not constitute a general class:

> "Rule" does not include, and [WIS. STAT. §] 227.10 does not apply to, any action or inaction of an agency, whether it would otherwise meet the definition under this subsection, which:
>
> ….
>
> (c) Is an order directed to a specifically named person or to a group of specifically named persons that does not constitute a general class, and which is served on the person or persons to whom it is directed by the appropriate means applicable to the order. The fact that a named person serves a group of unnamed persons that will also be affected does not make an order a rule.

Sec. 227.01(13)(c). Relatedly, § 227.10(1) provides that an agency action does not constitute a "rule" if it is a "statement of policy or an interpretation of a statute made in the decision of a contested case … or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts." Sec. 227.10(1). An agency action that satisfies one of these exceptions in § 227.10(1) is not of "general application." *Frankenthal*, 3 Wis. 2d at 257B.

¶52 Midwest argues that the Order is of "general application" because the language of the Order demonstrates that it generally applies to all existing and future retail customers of the four named utilities and all existing and future third-party ARCs. For their part, Respondents contend that the Order regulates only the four utilities named in the Order and not a general class of retail customers and third-party ARCs.

28

¶53 As we now explain, we conclude that the Order is of "general application" because the Order regulates a class comprising existing and future retail customers of four large electric utilities in Wisconsin and existing and future third-party ARCs by explicitly prohibiting these individuals and entities from participating in demand response activities in MISO markets.

¶54 To determine whether the Order regulates a class of individuals or entities within the meaning of the case law cited above, we begin with the language of the Order itself. As noted above, the Order is titled "Order Temporarily Prohibiting Operation of Aggregators of Retail Customers." In its first sentence, the Order states that it "temporarily prohibits the operation of Aggregators of Retail Customers (ARCs) in Wisconsin." The second sentence underscores the object of the Order's prohibition: "Temporarily prohibiting ARCs will provide the Commission with an opportunity to analyze the financial implications that ARCs may have for Wisconsin ratepayers and electric utilities and to investigate the effects that ARCs may have on utility-sponsored demand response programs and utility planning."

¶55 The Order continues by describing the ordinary operation of demand response aggregation in terms of conduct by retail customers and ARCs, not actions by utilities:

> Customers take their contract right[s] to receive retail electric service, which is an option right, and *transfer and assign it to an ARC*. This option to purchase electric energy then becomes part of the ARC's demand response bid in the [wholesale] market. Essentially, *retail customers sell to ARCs their option right to purchase electricity* at an average cost that exists because of state regulation. *ARCs then resell this option in the wholesale market.*

(Emphasis added.) This language establishes that the Order prohibits existing and future retail customers from transferring, assigning, or selling contract rights to ARCs and prohibits existing and future ARCs from reselling those option rights in wholesale electricity markets.

¶56 Finally, the prohibition sentence—the central focus of the parties' dispute as to whether the Order is of "general application"—confirms that the Order regulates retail customers and third-party ARCs by prohibiting their participation in demand response in MISO markets. To repeat, this prohibition sentence provides:

> As a condition on the provision of electric service, demand response load reductions of retail customers of the four Wisconsin electric utilities which distribute more than 4 million MWh per year (named above) are prohibited from being transferred to MISO markets directly by retail customers or by third-party ARCs.

As Midwest correctly observes, the conduct prohibited by this sentence is conduct that would potentially be performed by retail customers and third-party ARCs. Indeed, when this sentence is stripped of its prepositional phrases and rephrased in the affirmative, it reads as follows: The Commission prohibits existing and future retail customers of the four utilities and existing and future third-party ARCs from transferring those customers' demand response load reductions to MISO markets. Accordingly, we conclude that the Order regulates existing and future retail customers and third-party ARCs because it prohibits the activities of these individuals and entities, and therefore controls them by restricting their conduct.

¶57 Our conclusion is further supported by the language of 18 C.F.R. § 35.28(g)(1)(iii), which the Order references and that the Order was specifically adopted to satisfy.[23] As explained above, this opt-out provision in FERC Order No. 719 requires that the state regulatory authority—here, the Commission—prohibit conduct of ARCs:

> An independent system operator or regional transmission organization must not accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, where the relevant electric retail regulatory authority *prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers*.

18 C.F.R. § 35.28(g)(1)(iii) (emphasis added). According to this unambiguous language, in order for a state regulator to satisfy this opt-out provision, it must put into effect a state regulatory prohibition on ARCs bidding retail customers' demand response into wholesale electricity markets. The Order would not satisfy this opt-out provision solely by prohibiting utilities from facilitating the market for demand response. Thus, this regulation further shows that the Order is directed to

---

[23] The Order explicitly identifies the federal opt-out provision, 18 C.F.R. § 35.28(g)(1)(iii), as the basis for its prohibition on demand response by customers and ARCs:

> In light of the foregoing considerations, the Commission concludes that it is appropriate to prohibit the transfer of demand response load reductions to MISO markets directly by retail customers or by third-party ARCs of the four Wisconsin electric utilities which distribute more than 4 million MWh per year. 18 C.F.R. § 35.28(g)(1)(iii).

The parties do not dispute that the Commission issued the Order in an attempt to satisfy this opt-out provision.

existing and future retail customers of the four large Wisconsin utilities and existing and future third-party ARCs, not the four utilities themselves.

¶58    Our conclusion that the Order is of "general application" is also supported by the reasoning in *Citizens for Sensible Zoning*, *Cholvin*, and *Palm*. As previously noted, in *Citizens for Sensible Zoning*, the Department of Natural Resources adopted a floodplain ordinance that applied to individuals with a legal interest in land in certain areas of Columbia County.  *Citizens for Sensible Zoning*, 90 Wis. 2d at 814-15.  Our supreme court stated that this ordinance was of "general application" because the class of people to whom it applied, though small, was described in general terms and new members could be added to that class.  *Id.* at 816.  In *Cholvin*, the Wisconsin Department of Health and Family Services issued an instruction that changed the way that Medicaid applicants were screened for benefit eligibility.  *Cholvin*, 313 Wis. 2d 749, ¶13.  We concluded that this instruction was of "general application" because it was not limited to an individual applicant or a specific case.  *Id.*, ¶25.  Although the instruction did not in fact affect each applicant, we concluded that the instruction applied to all applicants because the screener was always required to consider the instruction when determining whether the applicant was eligible for benefits.  *Id.*  The reasoning was similar in *Palm*, in which the Department of Health Services issued an order in response to the COVID-19 pandemic that prohibited travel and required certain businesses to close.  *Palm*, 391 Wis. 2d 497, ¶7.  Our supreme court relied on the reasoning in both *Citizens for Sensible Zoning* and *Cholvin* and concluded that this order was of "general application."  *Id.*, ¶24.  The court stated that the focus of the inquiry regarding whether an agency action is of "general application" is whether the class of people and entities regulated is

described in general terms and there is an ability to add new members to the class. *Id.*, ¶¶20-25.

¶59     As in these earlier cases, the Order here is of general application. It is not limited to an individual retail customer or ARC or to a specific factual scenario or contested case. The Order applies to all existing and future retail customers of the four named utilities and all existing and future third-party ARCs. It is true that, like the limited class of property owners in *Citizens for Sensible Zoning*, the Order does not affect every retail electricity customer in Wisconsin. Yet, as explained above, the Order applies generally to all retail customers of Wisconsin's four large utilities and third-party ARCs, including individuals who were not retail customers of those utilities at the time the Order was issued and third-party ARCs that did not exist at the time the Order was issued. Therefore, the class of individuals and entities regulated is described in general terms and new members can be added to the class.

¶60     Respondents raise a number of unpersuasive arguments in support of their position that the Order is not of general application. We address and reject them in turn.

¶61     First, Respondents argue that the Order regulates only the four utilities named in the Order because the first clause of the prohibition sentence states "[a]s a condition on the provision of electric service." According to Respondents, only electric utilities provide electrical service, and retail customers and ARCs do not. Based on this clause, Respondents contend that the Order must be interpreted as prohibiting the four utilities from facilitating the "market" for retail customers and third-party ARCs to bid demand response into MISO markets.

¶62 We are not persuaded. As explained above, we interpret an order of an administrative agency in the same manner as statutes. *See Thomson*, 242 Wis. at 596. Accordingly, we interpret the language of the Order in context and give the words chosen by the Commission their ordinary meanings under a plain language interpretation. *See Kalal*, 271 Wis. 2d 633, ¶¶45-46. When construed in isolation, the clause "[a]s a condition on the provision of service" is ambiguous. On the one hand, this phrase could be reasonably interpreted as framing the Order in a way that governs the four utilities' abilities to provide electric service. On the other hand, this clause could also be reasonably interpreted as framing the Order in a way that governs retail customers' and third-party ARCs' ability to receive or be provided with electric service.

¶63 However, when construed in the context of the entire Order, we conclude that the only reasonable interpretation is that this clause frames the Order as a regulation of retail customers and third-party ARCs. As explained above, the language of the prohibition sentence restricts conduct only of retail customers and third-party ARCs. This is consistent with the language in the rest of the Order that unambiguously prohibits retail customers and third-party ARCs—not the utilities—from participating in demand response in MISO markets. Indeed, nothing in the Order indicates that such a prohibition could be achieved by imposing on the utilities a condition on the service they provide. If the Commission had intended to prohibit retail customers and third-party ARCs from participating in demand response in MISO markets by controlling actions by the utilities, the Order would have described the particular actions that the utilities would need to perform or cease in order to achieve that result. Thus, the only reasonable interpretation of the clause "[a]s a condition on the provision of service," when interpreted in the context of the entire Order, is that it pertains to

the prohibitions directed to retail customers and third-party ARCs as set forth in the remaining portion of the prohibition sentence.

¶64   This conclusion is supported by the fact that the four utilities in this litigation are not referenced in the prohibition sentence except in a prepositional phrase that merely modifies the object of the prohibition on demand response: retail customers and third-party ARCs.  In other words, the first clause of the prohibition sentence does not alter the unambiguous meaning of the rest of that sentence or the other sections of the Order, previously identified, which support our conclusion.

¶65   Second, Wisconsin Utilities argues that the Order regulates the four utilities because the Order's description of demand response aggregation identifies one way in which such aggregation implicates the conduct of utilities. Specifically, Wisconsin Utilities directs our attention to the following portion of the Order:

> Customers take their contract right to receive retail electric service, which is an option right, and transfer and assign it to an ARC.  This option to purchase electric energy then becomes part of the ARC's demand response bid in the RTO energy market or ancillary services market.

According to Wisconsin Utilities, this prohibits the four utilities from offering retail electric service to customers that could be transferred to ARCs.  We disagree.  Although this language references the contract between the utility and the retail customer, it describes demand response aggregation solely in terms of conduct of the retail customer and the ARC.  Nothing in this portion of the Order requires utilities to prevent the retail customer from transferring the customer's contract right to an ARC or otherwise prevent the customer from participating in

demand response aggregation in MISO markets. Nor does this language indicate that utilities have the ability to do this.

¶66 Third, Wisconsin Utilities argues that retail customers' participation in demand response aggregation requires "facilitating actions by the utility in its role as service provider." For example, Wisconsin Utilities contends that a customer who wishes to participate in demand response through a third-party ARC would need the utility to amend its tariff to allow the ARC to access the customer's service account and utility meter. This argument fails because Respondents did not raise this argument in the circuit court. Neither the Commission nor Wisconsin Utilities asserted in their circuit court briefing that the Order prohibits utilities from modifying their tariffs or otherwise facilitating participation in demand response. We typically decline to address arguments that are raised for the first time on appeal, and Respondents fail to provide a good reason for us to depart from that general rule here. *See **State v. Reese***, 2014 WI App 27, ¶14 n.2, 353 Wis. 2d 266, 844 N.W.2d 396.[24]

¶67 Fourth, Wisconsin Utilities argues that the opt-out provision in 18 C.F.R. § 35.28(g)(1)(iii) does not require a prohibition directed to retail customers or ARCs. Rather, Wisconsin Utilities contends, this opt-out provision may be

---

[24] Wisconsin Utilities' argument that utilities must facilitate retail customers' participation in demand response aggregation in MISO markets also fails because it is undeveloped. On appeal, Wisconsin Utilities supports its argument by directing our attention to two statutes—WIS. STAT. §§ 196.19 and 196.20(1)—and asserting that these statutes show that utilities must take certain actions to facilitate demand response. However, Wisconsin Utilities does not develop any argument showing how the particular language of those statutes demonstrates that utilities must facilitate the participation of retail customers in demand response aggregation activities in MISO markets. We need not address undeveloped arguments, and we decline to do so here. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

satisfied if a state regulatory authority regulates utilities in such a way that effectively prohibits ARCs from bidding retail customers' demand response into the wholesale markets. We are not persuaded. As explained above, the opt-out provision in 18 C.F.R. § 35.28(g)(1)(iii) requires the state regulatory authority to prohibit ARCs from bidding retail customers' demand response into wholesale markets. The unambiguous language of the Order carries out this explicit opt-out provision by prohibiting retail customers and third-party ARCS from transferring demand response load reductions to MISO markets.

¶68 Fifth, Respondents point to the exception to the definition of a "rule" in WIS. STAT. § 227.01(13)(c) and argue that the Order cannot be of "general application" because each of the four utilities is a "named person" that "serves a group of unnamed persons that will also be affected." This argument misses the mark because the exception set forth in § 227.01(13)(c) applies only if the Order is "*directed to* a specifically named person or group of specifically named persons that does not constitute a general class." Sec. 227.01(13)(c) (emphasis added). The fact that the utilities are mentioned in the Order does not mean that the Order is "directed to" them. Rather, as explained above, the language of the Order shows that the Order regulates the retail customers of the four utilities and third-party ARCs. There is no explicit prohibition or restriction in the Order that applies to the utilities mentioned.[25]

---

[25] Midwest also argues that, if the Order was directed to the four utilities as Respondents contend, then the utilities would have needed to file amended rules of service with the Commission and the Commission would have needed to hold a hearing to approve those changes pursuant to WIS. STAT. § 196.20(1). Because we conclude that the Order is directed to the retail customers of the four named utilities and third-party ARCs, we do not address whether the administrative procedures set forth in § 196.20(1) would apply if the Order was instead directed to the utilities.

¶69    Sixth, Respondents argue that the Order is not a rule pursuant to WIS. STAT. § 227.10(1), which provides that an agency action is not a "rule" if it is a "statement of policy or an interpretation of a statute made in the decision of a contested case … or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts." Sec. 227.10(1). According to Respondents, the Order is a "statement of policy" made in the disposition of a particular matter as applied to a specific set of facts.

¶70    We reject this argument for two reasons. First, we have already concluded that the Order is a regulation. Second, the Order is not "an agency decision upon or disposition of a particular matter as applied to a specific set of facts." WIS. STAT. § 227.10(1). The Order's prohibition is not limited to specific facts of a specific case. Consistent with that, the Order contains no factual findings or legal conclusions. Indeed, no specific case hearing was held in which the affected retail customers and ARCs were heard and a factual record could be developed. Instead, the prohibition contained in the Order applies generally to all existing and future retail customers of the four utilities and all existing and future third-party ARCs. Thus, § 227.10(1) does not alter our conclusion that the Order is of general application.

## C. Effect of Law

¶71    Turning to the third element of the test, an agency action has the "effect of law" when the agency uses "express mandatory language" that is "more than informational" and "speaks with an official voice intended to have the effect of law." *Milwaukee Area Joint Plumbing Apprenticeship Comm.*, 172 Wis. 2d at 321 & n.12. An agency action has the "effect of law" when: "criminal or civil sanctions can result [from] a violation"; "licensure can be denied"; or "the interest

of individuals in a class can be legally affected through enforcement of the agency action." *Cholvin*, 313 Wis. 2d 749, ¶26. For example, in *Cholvin*, this court concluded that written instructions for screening Medicaid applicants had the effect of law because the instructions used express mandatory language that was directory, were applied uniformly without any variations, and affected certain individuals' eligibility to receive Medicaid benefits. *Id.*, ¶¶27, 29.

¶72 Similarly here, the Order's prohibition on retail customers of Wisconsin's large utilities and third-party ARCs from transferring demand response load reductions to MISO markets uses mandatory language and applies uniformly without variation. Further, the prohibition affects the interests of existing retail customers and third-party ARCs seeking to engage in this activity, as well as future retail customers and third-party ARCs joining the affected class. For these reasons, we conclude that the Order satisfies the third element of the definition of a rule.

¶73 Wisconsin Utilities argues that the Order does not have the effect of law because it is not enforced by imprisonment or civil forfeitures. However, a Commission order has the effect of law and it need not impose criminal or express civil sanctions for a violation. *See Thomson*, 242 Wis. at 596 (Commission orders have the same force of law as a statute).

### D. Implementing Legislation Enforced or Administered by the Commission

¶74 To satisfy the fifth element of the definition of a rule, an agency action must "implement, interpret or make specific legislation enforced or administered by such agency." *Id.*, ¶22 (quoting WIS. STAT. § 227.01(13)). We focus on the term "implement." An agency action implements a statute when it carries out or gives practical effect to the statute. *Tavern League of Wis., Inc. v.*

*Palm*, 2021 WI 33, ¶33, 396 Wis. 2d 434, 957 N.W.2d 261 (lead op.); *see also Implement*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/implement (last visited May 29, 2024) (defining "implement" as to "carry out" or "accomplish" and "especially: to give practical effect to and ensure of actual fulfillment by concrete measures"). For example, our supreme court has determined that a flood plain zoning ordinance adopted by the Department of Natural Resources "implement[ed]" a statute that authorizes the Department to adopt flood plain zoning ordinances in certain circumstances. *Citizens for Sensible Zoning*, 90 Wis. 2d at 816.

¶75　　The Order here states that retail customers and third-party ARCs transferring demand response load reductions to MISO markets could be discriminatory pursuant to WIS. STAT. §§ 196.22, 196.60(1), and 196.60(3).[26]

---

[26] WISCONSIN STAT. § 196.22 provides:

> No public utility may charge, demand, collect or receive more or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in the schedules for the service filed under [WIS. STAT. §] 196.19, including schedules of joint rates, as may at the time be in force, or demand, collect or receive any rate, toll or charge not specified in the schedule.

Similarly, WIS. STAT. § 196.60 provides in relevant part:

> (1)(a) No public utility …, directly or indirectly, may charge, demand, collect or receive from any person more or less compensation for any service rendered or to be rendered by it in or affecting or relating to the production, transmission, delivery or furnishing of heat, light, water, or power or for any service in connection therewith, than that prescribed in the published schedules or tariffs then in force, or established under this chapter, or than it charges, demands, collects or receives from any other person for a like contemporaneous service.
>
> ….

(continued)

These statutes generally prohibit public utilities from discriminating when providing service, such as by charging a rate to an individual that deviates from the rates specified in the utilities' tariffs or differs from the rate charged to other individuals for similar service. The Order states that "customers selling load reductions through ARCs, or acting as ARCs themselves, have the potential for securing electricity at net lower rates than the rates authorized by the Commission," and these lower rates "could impose additional costs on other ratepayers and could be discriminatory." The Order also identifies WIS. STAT. § 196.37(2) as a source of the Commission's authority to issue the Order, which allows the Commission to issue an order relating to a practice that it determines to be unjustly "discriminatory." Sec. 196.37(2).[27] Respondents do not dispute that the Order's prohibition on demand response activities was intended, in part, to afford the Commission additional time to investigate whether those activities would result in discrimination under § 196.37(2).

---

> (3) If a public utility gives an unreasonable preference or advantage to any person or subjects any person to any unreasonable prejudice or disadvantage, the public utility shall be deemed guilty of unjust discrimination. A public utility violating this subsection shall forfeit not less than $50 nor more than $5,000 for each offense.

[27] WISCONSIN STAT. § 196.37(2) provides:

> If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, … the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed in the future.

41

¶76     We conclude that the Order carries out and gives practical effect to these statutes, not only by identifying specific conduct as potentially violating the statutory prohibition on rate discrimination, but also by identifying WIS. STAT. § 196.37(2) as authorizing the Commission to issue an order prohibiting such discriminatory practices.  The operation of the Order is analogous to the operation of the permits in *Wisconsin Electric Power Co.*  Like the statute in that case that generally prohibits the discharge of pollutants without a permit, the statutes identified in the Order—WIS. STAT. §§ 196.22, 196.60(1), and 196.60(3)— generally prohibit public utilities from discriminating when rendering service.  *See Wisconsin Elec. Power Co.*, 93 Wis. 2d at 235.  Also, like the permits in that case that prohibit companies from discharging chlorine above certain limits, the Order prohibits retail customers of the four utilities and third-party ARCs from transferring demand response load reductions to MISO markets.  *See id.*  In other words, the Commission is using the Order as the "implementing mechanism" by which the Commission carries out its authority to prohibit discriminatory practices.  *See Tavern League*, 396 Wis. 2d 434, ¶33 (lead op.) (explaining that agency actions may be an "implementing mechanism" to "carry out" statutory directives).  For these reasons, we conclude that the Order implements §§ 196.22, 196.37(2), 196.60(1), and 196.60(3) and satisfies the fifth definitional element of a rule.[28]

---

[28] The parties also dispute whether the Order is a new interpretation of an ambiguous statute.  In *Lamar Central Outdoor, LLC v. DHA*, 2019 WI 109, 389 Wis. 2d 486, 936 N.W.2d 573, our supreme court held that WIS. STAT. § 227.10(1) requires an agency to adopt a new rule every time it creates a new interpretation of an ambiguous statute, even if the agency is doing so as part of a decision upon a specific set of facts.  *Lamar*, 389 Wis. 2d 486, ¶23.  Because we conclude that the Order satisfies the fifth definitional element of a rule by *implementing* certain statutes, we need not address whether the Order creates a new *interpretation* of any ambiguous statutes.  *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842

(continued)

¶77 Respondents concede in their briefing on appeal that the Order is premised on the Commission's determination that the practice of demand response participation in federal wholesale electricity markets could result in discriminatory pricing under WIS. STAT. § 196.37(2). However, Wisconsin Utilities argues that the Order identifies WIS. STAT. §§ 196.22, 196.60(1), and 196.60(3) not to implement them, but only to provide authority to support a one-time action. For example, Wisconsin Utilities notes, the Order does not explain that the Commission intends to implement these statutes in separate, future cases. Assuming without deciding that Wisconsin Utilities is correct that an implementation of a statute must have prospective effect, this argument fails. The Order, still in place, operates on an ongoing basis to prohibit all current and future retail customers of the four utilities and third-party ARCs from participating in demand response in MISO markets. Further, it will continue to impose this prohibition on present and future retail customers and third-party ARCs until the Commission rescinds the Order. Thus, we reject Wisconsin Utilities' argument that the Order is merely a one-time action with no prospective effect.

¶78 In sum, we conclude that the Order meets all five elements of the statutory definition of a rule in WIS. STAT. § 227.01(13). Because Respondents concede that the Order was not proposed or promulgated in compliance with the pertinent rulemaking procedures set forth in WIS. STAT. ch. 227, it is invalid and unenforceable. *See **Tavern League***, 396 Wis. 2d 434, ¶34 (lead op.); WIS. STAT. § 227.40(4)(a).

---

N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

## V.  Injunctive Relief

¶79    In addition to requesting a declaratory judgment that the Order is invalid as an unpromulgated rule, Midwest requests an injunction to enjoin the Commission from asserting or exercising authority over electricity customers' and third-party aggregators' participation in wholesale markets through demand response activities.  We decline this request.  During oral argument, Midwest's counsel clarified that, pursuant to our supreme court's decision in *Tavern League*, we need not address its request for injunctive relief if we decide that the circuit court must declare the Order invalid as an unpromulgated rule.  Indeed, the lead opinion in *Tavern League* states that the effect of declaring an order invalid as an unpromulgated rule necessarily operates to enjoin further enforcement of the order.  *Tavern League*, 396 Wis. 2d 434, ¶34 n.11 (lead op.) (declining to address whether the court of appeals properly directed that a temporary restraining order be imposed on an agency because the agency action was invalid as an unpromulgated rule).  Therefore, we do not address Midwest's request for injunctive relief.

## CONCLUSION

¶80    For the foregoing reasons, we conclude that the Order meets the definition of a rule set forth in WIS. STAT. § 227.01(13) and, therefore, should have been proposed and promulgated in compliance with the rulemaking procedures set forth in WIS. STAT. ch. 227.  Because it was not, the Order is invalid and unenforceable.  Therefore, we reverse the order of the circuit court and remand for that court to enter a judgment consistent with this opinion declaring the Order invalid.

*By the Court.*—Order reversed and cause remanded with directions.